# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS, DEL RIO DIVISION

| | |
|---|---|
| **CORINA CAMACHO, Individually and on behalf of G.M., a Minor; SELENA SANCHEZ, Individually and on behalf of D.J., a Minor; TANISHA RODRIGUEZ, Individually and on behalf of G.R., a Minor; AMANDA ESCOBEDO, Individually and on behalf of A.E., a Minor and on behalf of A.T., a Minor; ANGELICA TALLEY, Individually and on behalf of M.T., a Minor; ROCIO RODRIGUEZ, Individually and on behalf of F.R., a Minor; STEPHANIE CASTILLO, Individually and on behalf of A.O., a Minor; and GLADYS GONZALEZ, Individually and on behalf of C.G., a Minor.**<br><br>                                        **Plaintiffs,**<br>**v.**<br><br>**THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT and THE TEXAS DEPARTMENT OF PUBLIC SAFETY and JOHN DOE COMPANY 1, and JOHN DOES 1-100**<br><br>                                        **Defendants.** | Case No.    2:24-cv-00054<br><br>**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**<br><br>(1)  42 U.S.C. § 1983 – 14th Amendment<br><br>(2)  42 U.S.C. § 1983 – 4th Amendment<br><br>(3)  Negligence<br><br>(4)  Intentional Infliction of Emotional Distress<br><br>(5)  Punitive / Exemplary Damages |

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ........................................................................................................ 4

JURISDICTION AND VENUE ................................................................................... 6

THE PARTIES ............................................................................................................. 7

I.     FACTUAL ALLEGATIONS ............................................................................. 10

       A.     The Rise of School Shootings in America and The Vulnerability of Our
              School ...................................................................................................... 11

       B.     State-Mandated Lockdown Protocols Direct Students and Teachers to Stay
              Still and Silent until Law Enforcement Officers Release Them. .................... 13

       C.     In an Active Shooter Incident, Law Enforcement Officers Must Immediately
              Isolate and Neutralize the Shooter. ..................................................... 15

       D.     Law Enforcement Officers Who Confine an Active Shooter with Locked
              Down Children and Teachers Create a Death Trap ........................................ 18

       E.     Robb Elementary School ......................................................................... 19

       F.     May 24, 2022 ........................................................................................... 20

       G.     The Active Shooter Approaches Robb Elementary School............................. 22

       H.     The Active Shooter Enters Robb Elementary School West Building. ........... 23

       I.     Defendant Officers from the TXDPS Arrive on Scene within Two Minutes of
              the Shooter Entering the School, While the Shooter is Shooting Inside
              Classrooms 111 and 112. ........................................................................ 25

       J.     UCISD-PD Officers Retreat, Trapping Students and Teachers with the
              Active Shooter, while TXDPS Officers Hesitate. ......................................... 27

       K.     The Uvalde County District Attorney's Office Alerts TXDPS Ranger Kindell
              About the Active Shooting. ..................................................................... 29

       L.     Defendants Stopped Parents from Rescuing the Children Trapped Inside
              Classrooms 111 and 112. ........................................................................ 33

       M.     Law Enforcement Officers Saved Themselves, Not Children, from the
              Shooter's Lethal Battle Rifle.................................................................... 34

2

**N.   Officers were Indifferent to the Fact that a Teacher Is Dying Inside Classroom 112.** ................................................................. **36**

**O.   A Fourth Grader Calls 911 from Inside Classroom 112 and Defendants Were Indifferent to the Children's and Teachers' Cries for Help.** .......................... **38**

**P.   Officers' Decision to Contain the Shooter with His Victims Caused Children and Teachers to Suffer and Die.** ........................................ **43**

**Q.   Plaintiffs Have Received Little Transparency and No Accountability.** ......... **44**

**II.   FIRST CAUSE OF ACTION: DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983** **47**

**III.   SECOND CAUSE OF ACTION: DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER)** ............... **50**

**IV.   THIRD CAUSE OF ACTION:  DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AMENDMENT, UNLAWFUL SEIZURE)** ..................... **51**

**V.   FOURTH CAUSE OF ACTION: UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO TRAIN/CREATION OF POLICY)** ................................................ **52**

**VI.   FIFTH CAUSE OF ACTION: UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S VIOLATION OF 42 U.S.C.  § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO TRAIN/CREATION OF POLICY)** .................................... **53**

**VII.   PUNITIVE DAMAGES** ........................................................ **54**

**VIII.  RELIEF SOUGHT** ............................................................ **54**

**IX.   DEMAND FOR JURY TRIAL** ................................................. **55**

**X.   SPOLIATION** ................................................................ **55**

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**COMPLAINT**

COMES NOW Plaintiffs, CORINA CAMACHO, Individually and on behalf of G.M., a Minor; SELENA SANCHEZ, Individually and on behalf of D.J., a Minor; TANISHA RODRIGUEZ, Individually and on behalf of G.R., a Minor; AMANDA ESCOBEDO, Individually and on behalf of A.E., a Minor and on behalf of A.T., a Minor; ANGELICA TALLEY, Individually and on behalf of M.T., a Minor; ROCIO RODRIGUEZ, Individually and on behalf of F.R., a Minor; STEPHANIE CASTILLO, Individually and on behalf of A.O., a Minor; and GLADYS GONZALEZ, Individually and on behalf of C.G., a Minor., complaining of Defendants, THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; THE TEXAS DEPARTMENT OF PUBLIC SAFETY (TDPS); and JOHN DOE COMPANY 1 and JOHN DOES 1-100 and each of them, and allege as follows:

**INTRODUCTION**

1.      On May 24, 2022, Uvalde, Texas had one of the worst school massacres in U.S. history. 19 children and two teachers were killed, and countless others injured and traumatized while school officials and hundreds of law enforcement personnel stood by failing to act. An 18-year-old Uvalde man (the "shooter") with a history of mental disturbance, instability, and domestic issues legally purchased AR-15 semi-automatic rifles, ammunition, high-capacity magazines to use in the massacre.  Due to the conduct of the Uvalde Consolidated Independent School District (the "School District") and the Texas Department of Public Safety and their deliberate indifference to the rights of the children, the shooter entered the Uvalde elementary school unabated, wearing tactical gear, and was left free to shoot, terrorize, and kill children and teachers for over an hour without interference from the School District and Texas law enforcement officers who stood just feet away.  Texas active shooter training requires officers to

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

follow active shooter training and immediately neutralize the active shooter. Instead, the 376 officers who responded to Robb Elementary School stood by taking no action against the shooter, and instead locking down and containing the children with the shooter for one hour, fourteen minutes allowing the shooter to torture and terrify wounded and dying children and to find and kill children who were trying to hide.

2.      Defendant TXDPS Director McCraw testified before the Texas Senate Special Committee to Protect all Texans calling the law enforcement response "an abject failure and anti-thetical to everything learned over the last two decades since the Columbine massacre."

3.      United States Attorney General Merrick Garland said, "The law enforcement response to the mass shooting at Robb Elementary was a failure," noting that "It is now widely understood by law enforcement agencies across the country that, inactive shooter incidents, time is not on the side of law enforcement. Every second counts. And the priority of law enforcement must be to immediately enter the room and stop the shooter with whatever weapons and tools officers have with them."

4.      United States Associate Attorney General Vanita Gupta said, "It is hard to look at the truth – that the law enforcement response on May 24 was an unimaginable failure and that a lack of action by adults failed to protect children and their teachers."

5.      The craven actions of the School District Police Department (UCISD-PD) have been widely publicized and are well-known, but the equally culpable actions by Texas Department of Public Safety (TXDPS) officers have been shielded from public scrutiny. It is time for the Defendants to Uvalde's families, and to Texas's schools, teachers, students, and their parents. Ninety-one TXDPS officers responded to Robb Elementary School on May 24, 2022, while the School District police were only five on scene. The TXDPS 2022 budget was $1.6

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

billion; the School District's was three-tenths of one percent (.03%) of that amount. The leadership and tactical skills and experience of TXDPS officers far surpassed the experience and abilities of local officials and everyone on scene knew it.

6.    TXDPS has fought the public disclosure of its own officers' body camera footage, radio channel recordings, dispatch logs, and officer interviews and investigations. This lawsuit seeks to end that cover-up.

7.    Plaintiffs were Robb Elementary school children on May 24, 2022, who were in and near Classrooms 111 and 112.

8.    Defendants are law enforcement agencies who confined students and teachers at Robb Elementary School with the active shooter, giving the Shooter the opportunity to torture and terrify wounded and dying children and to find and kill children who were trying to hide. Defendants are the law enforcement agencies who prevented the Plaintiffs' families from rescuing their children. Defendants are the law enforcement agencies who prevented medical aid from reaching the children.

## JURISDICTION AND VENUE

9.    This case is brought under 42 U.S.C. § 1983 and under state law.

10.    Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 (federal question) and 1343 (federal civil rights). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because the state law claims are intertwined with the federal claims.

11.    Venue is proper in the Western District of Texas, Del Rio Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district. Defendants regularly conduct business in this district, and the wrongdoing giving rise to Plaintiffs' claims occurred in Uvalde County, Texas, which is within this district and division.

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

See 28 U.S.C. § 124(d)(5).

## THE PARTIES

12.     **G.M.** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother, Corina M. Camacho, in Uvalde, Texas.  G.M., a male, age 10 on the day of the massacre, was in Classroom 112 where he and other students were shot.  G.M. was shot in his right leg.

13.     **Corina Camacho** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Camacho is the legal and biological mother of G.M. and sues individually and on behalf of her son, G.M.

14.     **G.R.** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided with her legal and biological mother, Tanisha Rodriquez in Uvalde, Texas.  G.M., a female, was age 9 on the day of massacre when the shooter entered the school campus, shooting near her where she was playing on the playground before G.R. was rushed inside.  The shooter entered the school, killing her friends and teachers.

15.     **Tanisha Rodriguez** is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Ms. Rodriquez is the legal and biological mother of G.R. and sues individually and on behalf of her daughter, G.R.

16.     **D.J.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Selena Sanchez.  D.J., a male, was age 8 on the day of massacre, when he saw the shooter shooting towards the school as he passed between buildings running for cover.  The shooter entered the school killing his friends and teachers.

17.     **Selena Sanchez** is a resident of the State of Texas, and during the time of the

events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Sanchez is the legal and biological mother of D.J. and sues individually and on behalf of her son, D.J.

18.     **A.T.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Amanda Escobedo.  A.T., a male, was age 10 on the day of massacre, when he hid for cover behind some backpacks in room #109 and saw the shooter. The shooter entered the school killing his friends and teachers.

19.     **A.E.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Amanda Escobedo.  A.E., a male, was age 8 on the day of massacre, when he hid under his desk in room #19 and could hear the bullets firing in the building next over. The shooter entered the school killing his friends and teachers.

20.     **Amanda Escobedo** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Escobedo is the legal and biological mother of A.T. and A.E. and sues individually and on behalf of her two sons, A.T. and A.E.

21.     **M.T.** is a resident of the state of Texas and during the time of the events giving rise to the lawsuit, resided with his legal and biological mother Angelica Talley.  M.T., a male, was age 9 on the day of massacre, when he was outside in P.E class when the shooter jumped the fence and started shooting at his teachers. M.T. ran for cover inside a fourth-grade building near the library. The shooter entered the school killing his friends and teachers.

22.     **Angelica Talley** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Talley is the legal and biological mother of M.T. and sues individually and on behalf of her son, M.T.

23.     **F.R.** is a resident of the state of Texas and during the time of the events giving

rise to this lawsuit, resided with his legal and biological mother Rocio Rodriguez. F.R. a male, was age 8 on the day of the massacre. The shooter entered the school killing his friends and teachers.

24.     **Rocio Rodriguez** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Rodriguez is the legal and biological mother of F.R. and sues individually and on behalf of her son, F.R.

25.     **A.O.** is a resident of the state of Texas and during the time of the events giving rise to this lawsuit, resided with her legal and biological mother Stephanie Castillo. A.O. a female, was age 9 on the day of the massacre. The shooter entered the school killing her friends and teachers.

26.     **Stephanie Castillo** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Castillo is the legal and biological mother of A.O. and sues individually and on behalf of her daughter A.O.

27.     **C.G.** is a resident of the state of Texas and during the time of the events giving rise to this lawsuit, resided with her legal and biological mother Gladys Gonzalez. C.G. a female, was age 10 on the day of the massacre. The shooter entered the school killing her friends and teachers.

28.     **Gladys Gonzalez** is a resident of the State of Texas, and during the time of the events giving rise to lawsuit, resided in Uvalde, Texas. Ms. Gonzalez is the legal and biological mother of C.G. and sues individually and on behalf of her daughter C.G.

29.     **The Texas Department of Public Safety ("TDPS")** a law enforcement agency organized and run by the State of Texas. Texas is charged by law with the administration and operation of TDPS, including the employment, control, supervision, discipline, training, and

practices of TDPS's personnel and employees, and with the formulation of its policies, practices, and customs and is legally responsible for the acts and omissions of TDPS. TDPS may be served with process at 5805 North Lamar Boulevard, Austin, Tex-as 78752.

30.     **The Uvalde Consolidated Independent School District (the "School District")** is a public school district in Uvalde, Texas. Robb Elementary is within the School District. The School District was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, campuses, and public-school business within its jurisdiction, including Robb Elementary. The School District acted or failed to act, at all relevant times, through its employees, agents, and/or chief policymakers, and is liable for such actions and/or failure to act. The Uvalde Consolidated Independent School District Police Department ("UCISD PD") is an agency of the School District.  The School District is charged by law with the administration and operation of UCISD PD, including the employment, control, supervision, discipline, training, and practices of UCISD PD's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of UCISD PD. The School District and UCISD PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.  The School District may be served with process through its Superintendent, Dr. Hal Harrell, at 1000 N. Getty Street, Uvalde, Tex-as 78801.

## I.     FACTUAL ALLEGATIONS

31.     On May 24, 2022 at Robb Elementary School, 376 officers responded to the scene. Those officers' actions trapped children, rather than releasing them. Officers increased the risk that children would be shot, rather than protecting them. Officers who would not help trapped children stopped parents from reaching them. Officers blocked medics from reaching the wounded until it was too late. This complaint begins to unveil what happened that day.

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

A.    **The Rise of School Shootings in America and The Vulnerability of Our**
      **School**

32.    On April 20, 1999, two high school seniors massacred twelve students and a
teacher at Columbine High School in Littleton, Colorado. It was the worst school shooting
America had ever seen.

33.    Since the Columbine shooting, the number of school-related gun violence has in-
creased, and school shootings have become increasingly fatal. More than 370,000 students have
experienced gun violence at school since Columbine.

34.    In the five years immediately before the Robb Elementary School shooting, the
incidence and fatality of school shootings rose even more exponentially.

35.    In the 2017-2018 school year, a student's chance of dying in a school shooting
reached its highest level in at least 25 years.

36.    The 2021-2022 school year had the highest number of school shootings since
record-keeping began in 2000.

37.    Also since Columbine, America has seen more and more attacks on schools where
the attacker intends to carry out a mass killing.

38.    On April 16, 2007, a student at Virginia Tech University shot and killed 32
students and educators and wounded at least 17 more people.

39.    On December 14, 2012, a troubled young man used an AR-15-style rifle to
murder 20 children and six educators at Sandy Hook Elementary School in Newtown,
Connecticut.

40.    On February 14, 2018, a gunman opened fire on students, teachers, and staff at
Marjory Stoneman Douglas High School in Parkland, Florida, killing 17 and injuring 17 more.

41.    School shootings have created a massive school security industry, on which

schools are spending $3 billion per year. Schools are implementing single-point-of-entry access, imposing visitor restrictions, automatically dead-bolting doors, installing bulletproof glass and panic buttons, and increasing the number and presence of security personnel.

42.     Texas had its own school shooting tragedy in May 2018. In what Governor Abbott called "one of the most heinous attacks that we've ever seen in the history of Texas schools," a student at Santa Fe High School in Santa Fe, Texas shot and killed eight students and two teachers and wounded 13 others. The attack ended when school security officers and a state trooper confronted and exchanged fire with the shooter.

43.     Texas's response to the Santa Fe shooting included legislation directing school districts to implement multi-hazard emergency operation plans, required additional training for school resource officers and school district employees, and created school threat assessment teams. As part of that response, Texas's Commissioner of Education promulgated rules requiring regular lockdown drills. Governor Abbott said the legislative package would do "more than Texas has ever done to make schools safer places for our students, for our educators, for our parents and families."

44.     But the massive investment it would take to actually harden Texas schools against an attacker with a battle rifle was not made. Texas's schools were not suddenly "safer places." Almost all of this state's nearly 9,000 school campuses were built before defense against a gunman with an AR-15 was a design necessity, and the legislature was not willing to appropriate the amount necessary to fund upgrades that could give students and teachers some protection from an active shooter.

45.     The School District with its 4,116 students at eight school campuses, received $69,000 to harden its schools in the wake of the Santa Fe shooting. Part of this money went to

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

build a five-foot perimeter fence around Robb Elementary School. On May 24, 2022, the Shooter easily jumped over that fence.

46.     In today's Texas, just like in the rest of America, the question is not if another mass shooting at a school will occur; the question is when.

47.     For Texas's schools, especially poorer schools like those in Uvalde County, it would be a matter of minutes at best, and seconds at worst, before an active shooter gained entry to the school. Students and teachers' survival would depend on the speed and effectiveness of the law enforcement response.

   **B.     State-Mandated Lockdown Protocols Direct Students and Teachers to Stay Still and Silent until Law Enforcement Officers Release Them.**

48.     Texas Education Code § 37.114 provides that the Texas Commissioner of Education, in consultation with the Texas School Safety Center and the state fire marshal, must adopt rules for best practices for conducting emergency school drills and exercises, including definitions for relevant terms.

49.     As part of the effort to make Texas schools safer after the Santa Fe High School shooting, the Commissioner of Education Mike Morath issued Texas Administrative Code Rule § 103.1209, "Mandatory School Drills."

50.     The Commissioner's new rules required school districts to conduct emergency safety drills. One of these was the lockdown drill.

51.     The rule defined a lockdown drill as "[a] response action schools take to secure interior portions of school buildings and grounds during incidents that pose an immediate threat of violence inside the school. The primary objective is to quickly ensure all school students, staff, and visitors are secured away from immediate danger." 19 TEX. ADMIN. CODE § 103.1209(b)(3).

52.     The Texas School Safety Center (TxSSC) is an official university-level research center at Texas State University in San Marcos, Texas, which provides K-12 schools in Texas with safety and security protocols and guidance, determining best practices for Texas schools.

53.     TxSSC provides a Standard Response Protocol for a lockdown ("the Texas Lockdown SRP").

54.     The Texas Lockdown SRP provides that "Lockdown is called when there is a threat or hazard inside the school building. From parental custody disputes to intruders to an active shooter, Lockdown uses classroom and school security actions to protect students and staff from threat."

55.     The Texas Lockdown SRP continues, "The Lockdown Protocol demands locking individual classroom doors, offices and other securable areas, moving room occupants out of line of sight of corridor windows and having room occupants maintain silence."

56.     Per the Texas Lockdown SRP, teachers and students must keep the classroom door closed until law enforcement officers open it: "Teacher, staff, and student training reinforces the practice of not opening the classroom door once in Lockdown. Rather, no indication of occupancy should be revealed until first responders open the door." That is, teachers and their students are trained – by official requirements – to remain in their classrooms during lockdowns with the door closed until law enforcement officers authorize them to leave.

57.     TxSSC materials, including the "Training and Drills" section of the "A Parent's Guide to School Safety Toolkit," encourage parents to reassure their children that the better they follow the lockdown drill instructions, the safer they will be in a real shooting.

58.     Per the TxSSC Parent's Guide, parents should teach their children to wait for law enforcement, even if it is "a real active threat emergency, such as an active shooter."

59.     Also, per the TxSSC Parent's Guide, students are not to use their phones: "During the lockdown drill, which is the drill used when a threat is located inside the school building, the skill of staying quiet is important to practice. During this drill, and in a real-life event, student and staff cellphones are to be silenced, and everyone is to stay quiet."

60.     Title 19 of the Texas Administrative Code § 103.1209 directs that schools conduct lockdown drills at least twice per year.

61.     As required by Texas law, Robb Elementary School, including the teachers and students in Classrooms 111 and 112, trained on the Texas Lockdown SRP.

62.     The teachers and students in Classrooms 111 and 112, and all of Robb Elementary School's faculty and students, were familiar with lockdowns. Because of the school's proximity to the border, teachers and students had experienced multiple lockdowns, in addition to the two drills per year required by Texas law.

63.     Robb teachers and students relied on and followed the lockdown protocols prescribed by the State of Texas. The lockdown summary protocol was posted just inside classroom doors: "LOCKDOWN: LOCKS, LIGHTS, OUT OF SIGHT." The posting directed students to move out of sight, to maintain silence, and to not open the door. It instructed teachers to: lock interior doors; turn out the lights; move away from sight, not open the door; maintain silence; and take attendance. Once locked down, students at Robb Elementary School—just like students at any other Texas school—would wait for law enforcement officers to come.

**C.     In an Active Shooter Incident, Law Enforcement Officers Must Immediately Isolate and Neutralize the Shooter.**

64.     The law enforcement community's agreed definition of an active shooter is "an individual actively engaged in killing or attempting to kill people in a confined and populated area." (The White House, United States Department of Justice, Federal Bureau of Investigation,

United States Department of Education, United States Department of Homeland Security and Federal Emergency Management Agency use this definition, as do other law enforcement agencies and training providers across the country).

65.     The definition of an active shooter— "an individual actively engaged in killing or attempting to kill people in a confined and populated area"—dictates the law enforcement response. It is law enforcement's job to immediately isolate and neutralize someone who is actively engaged in killing or attempting to kill people in a confined and populated area.

66.     Analysis of the failed law enforcement response to the 1999 Columbine school shooting led to a crystal-clear active shooter response doctrine.

67.     At Columbine, officers on the scene set up a perimeter and waited 47 minutes before entering the school. While they delayed, the two Columbine shooters casually killed and wounded students – and wounded students bled where they lay. Some died because of the law enforcement delay. Until Uvalde, Columbine was the model for what not to do.

68.     The lesson from Columbine was simple. Law enforcement delay in neutralizing an active shooter in a school would be measured in students' lives lost. A new active shooter doctrine was adopted by law enforcement agencies across the country. First responders must react immediately to confront the shooter to prevent further killing and to urgently render first aid to victims. In short, in an active shooter event, officers must confront the subject and stop his actions immediately. TXDPS Director McCraw acknowledged the standard: "the doctrine since [Columbine] has been that in an active shooter situation, it's to immediately locate the subject, isolate him and neutralize him."

69.     The Department of Justice's Critical Incident Review: Active Shooter at Robb Elementary School echoed this standard, stating "Since the tragic shooting at Columbine High

School in 1999, a fundamental precept in active shooter response and the generally accepted practice is that the first priority must be to immediately neutralize the subject; everything else, including officer safety, is subordinate to that objective."

70.     Advanced Law Enforcement Rapid Response Training (ALERRT) is nationally recognized as the preeminent active shooter/attack response training provider in the nation. ALERRT is based at Texas State University in San Marcos, Texas. More than 200,000 state, local, and tribal first responders (over 140,000 of them law enforcement) from all 50 states, the District of Columbia, and U.S. territories have received ALERRT training over the last 20 years.

71.     Each and every law enforcement department in the state of Texas, especially and including all departments present at Robb Elementary School on May 24, 2022, subscribed to, were trained on, and were bound to follow ALERRT protocols and training. TXDPS's training program includes a Reality Based Training Unit, which instructs the ALERRT Level 1 course to department members.

72.     ALERRT teaches that first responders' main priority in an active shooter incident is to first "Stop the Killing," then "Stop the Dying," and then "Evacuate the Injured."

73.     Officers responding to an active school shooting are to draw the shooter's attention away from potential victims, draw the shooter away from new or wounded victims, and take im-mediate action to neutralize the shooter, including use of necessary and deadly force.

74.     ALERRT doctrine requires law enforcement to act immediately. Waiting for equipment, more highly trained officers, and all other excuses for delay are unacceptable.

75.     Even waiting for a four-or five-person team of first-on-site officers to gather is not acceptable. Recent tactical training emphasizes solo officer response when the situation demands. The doctrine provides that, "[i]n many cases that immediate response means a single

(solo) officer response until such times as other forces can arrive. The best hope that innocent victims have is that officers immediately move into action to isolate, distract or neutralize the threat, even if that means one officer acting alone."

76.   From the moment a shot is fired at a school, it is an active shooter incident. "When a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a 'barricaded subject,'" said TXDPS Director McCraw.

77.   Director McCraw's statement is rudimentary: someone who fires a weapon at a school cannot be a barricaded subject. The International Association of Chiefs of Police defines a barricaded subject as "an individual who is the focus of a law enforcement intervention effort, who has taken a position in a physical location that does not allow immediate law enforcement access and is refusing law enforcement orders to ex-it" and "who is not suspected of committing a crime."

78.   ALERRT doctrine addresses the fact that taking immediate action to isolate and neutralize an armed attacker may be very dangerous for law enforcement officers. The doctrine clearly determines priority of life. The first priority is to preserve the lives of victims and potential victims. The second priority is the safety of officers, and the last priority is the suspect. Under ALERRT protocols, officers must act immediately, regardless of the risk to themselves.

**D.   Law Enforcement Officers Who Confine an Active Shooter with Locked Down Children and Teachers Create a Death Trap.**

79.   "If you don't immediately confront an active shooter, lives are going to be lost," TXDPS Di-rector McCraw stated.

80.   Lockdown protocols work in tandem with ALERRT immediate response protocols. Teachers and students are trained and required to freeze, hide, and stop any other efforts to protect themselves precisely because law enforcement officers are supposed to respond

immediately to keep students safe and stop the threat. Teachers and students do this because they are following rules laid down by Texas's Commissioner of Education.

81.     Lockdown deprives teachers and students of assistance from anyone but law enforcement. Parents and family members cannot contact them, find them, or reach them. Emergency medical responders cannot get through the law enforcement perimeter to treat the wounded. Once law enforcement officers arrive and set up a perimeter, they have undertaken to be the lone vector of rescue for teachers and students.

82.     Responding law enforcement officers have the sole power to determine how long locked down students and teachers will be confined with the shooter.

83.     According to ALERRT doctrine, the time of confinement in lock down with the active shooter should be as close to zero as possible, because the overwhelming priority is to "stop the killing and stop the dying."

84.     By prolonging a lockdown in an active shooter incident, law enforcement officers trap and confine students and teachers with the active shooter.

85.     By prolonging a lockdown in an active shooter incident, law enforcement officers require that trapped teachers and students remain in place, and thus increase the likelihood that a shooter will find and shoot a child or a teacher and that wounded victims will die.

86.     By prolonging a lockdown, law enforcement officers increase the terror and trauma students and teachers endure.

87.     Law enforcement officers know all of this. This is exactly why ALERRT training mandates an immediate neutralization of the shooter.

**E.     <u>Robb Elementary School</u>**

88.     Uvalde is a close-knit community. About 25,000 people live in Uvalde County, including the roughly 15,000 who live in the City of Uvalde.

89.    In the 2021-22 school year, Uvalde County Independent School District had 4,102 students. Robb Elementary School held the classrooms for about 600 second, third and fourth grade students.

90.    The ties between Uvalde's law enforcement community and its schools were particularly close. Law enforcement officers' children attended Robb Elementary, and their wives taught there. Robb Elementary's West building was full of fourth grade classrooms.



*Figure 1: Diagram of Robb Elementary School West Building*

**F.    <u>May 24, 2022</u>**

91.    May 24, 2022 was a Tuesday, and school started at 7:30 a.m.

92.    With the end of the school year approaching, the morning of May 24, 2022 at Robb Elementary School was for awards. Robb students gathered grade by grade for assemblies

to celebrate the year's hard work. Fourth graders went for their assembly at about 10:30 a.m.

93.     Proud parents in the audience watched as their children received honor roll certificates. After the ceremony, students posed for photos.

94.     The fourth-grade teachers led their students back to the classrooms lining the hallways of the West building.

95.     Teacher Arnulfo Reyes walked with his eleven students back to Classroom 111. Teachers Eve Mireles and Irma Garcia took their nineteen students back to Classroom 112.



Figure 1: Diagram of the Classrooms and Hallway Adjacent to Classrooms 111 and 112

96.     Like most other classrooms in the building, Classrooms 111 and 112 shared a double-width interior door.

97.     In Classroom 111, the students went back to watching *The Addams Family* while Mr. Reyes did some work at his desk. They had started watching the movie earlier that morning before the assembly.

98.     In Classroom 112, teachers Eva Mireles and Irma Garcia and their nineteen

21

students were watching *Lilo and Stitch*.

### G.    The Active Shooter Approaches Robb Elementary School.

99.    At 11:28 a.m., a young man (hereafter "the Shooter") crashed his truck in a ditch approximately 100 yards from Robb Elementary School. His plan was to "shoot up" Robb Elementary School. (11:28 a.m.).

100.    The Shooter got out of the truck and started firing. (11:29 a.m.).

101.    Uvalde's 911 dispatcher started to receive calls reporting shots fired. (11:29 a.m.).

102.    The Shooter climbed over the school's perimeter fence on the west side of the campus. (11:29 a.m.).

103.    Uvalde's 911 dispatcher received a report that the Shooter was on the school campus. (11:29 a.m.).

104.    Uvalde Police Department (hereafter "UPD") broadcasted that shots had been fired at Robb Elementary School. The broadcast asked all units to respond. (11:30 a.m.).

105.    Once a shot is fired at a school, it is an active shooter incident. As TXDPS Director McCraw has testified, "[w]hen a subject fires a weapon at a school he remains an active shooter until he is neutralized…." This was an active shooter incident.

106.    The Shooter kept shooting from the school parking lot near the West building. Then he walked along the outside of the West building. He fired into Classroom 102, shattering parts of the exterior window. (11:32 a.m.).

107.    Inside Classroom 102, children dropped and lay flat on the floor. (Allegations concerning the timing and sequencing of events inside the classrooms cannot be made with the same degree of specificity or certainty as allegations regarding most events taking place outside the classrooms. Plaintiffs therefore do not allege the time of events inside the classrooms.)

108.    The Shooter kept moving. He walked by the windows of Classrooms 103, 104,

105, and 106.

109.     All of those classrooms had students and/or teachers inside. In Classroom 106, the

teacher hid her students and prayed.

110.     The Shooter fired three barrages into the exterior walls and windows of

classrooms 103, 104, 105, and 106. (11:32 a.m.).



111.     Officers arriving on scene heard shots fired and knew this was an active shooter.

(11:32 a.m.). At least one officer already on scene was armed with an AR-15 and extra

magazines.

**H.     The Active Shooter Enters Robb Elementary School West Building.**

112.     The Shooter entered the West building via its northwest door, which was closed

but unlocked. (11:33 a.m.).

113.     The Shooter walked into the northwest hallway, then turned right. Classrooms

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

111 and 112 were on his left; Classrooms 105 and 106 were on his right. He started shooting into Classroom 111 or 112 through the walls and turned left into the vestibule in front of those rooms.

114.    UPD radio broadcast that there was a shooter inside Robb Elementary School, that there was a shooting inside, and that this was a "school shooting." (11:33 a.m.). The UPD broad-cast channel was accessible to all the law enforcement officers in the area, including UCISD-PD, County, TXDPS, and federal officers. On information and be-lief, some or all UCISD-PD and TXDPS officers responding to the scene heard broadcasts herein alleged on the UPD channel.

115.    In Classroom 111, Teacher Arnulfo Reyes heard a bang. He put the classroom in lockdown. He told the children to get under the table and act like they were asleep. He saw shrapnel come through the sheetrock walls of his classroom.

116.    One of the teachers in Classroom 112, either Eva Mireles or Irma Garcia, said, "we're on severe lockdown." A student turned off the movie. A teacher in Classroom 112 told her students to hide, and they hid behind their teacher's desk, behind the backpacks, and under a table.

117.    The Shooter entered either Classroom 111 or 112. (Witnesses in the classrooms differ about which classroom was entered first, and the existing investigations are also inconclusive.)

118.    In Classroom 111, the students had hidden under a table so that they wouldn't be visible from the doorway.

119.    Teacher Reyes turned around and saw the Shooter. The Shooter fired at him. Reyes couldn't feel his arm, and fell to the floor, face down. The Shooter fired under the table, where children were. The Shooter kept firing into Classroom 111.

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

120.     Bleeding on the floor, Mr. Reyes thought, "somebody's going to come help us."

121.     Defendant TXDPS Sergeant Juan Maldonado arrived on scene. (11:34 a.m.)

122.     In Classroom 112, the Shooter said, "It's time to die."

123.     The teachers in Classroom 112 attempted to protect their students with their bodies, standing in front of the children as the Shooter fired. He approached one of the teachers and said, "goodnight." He shot her in the head.

124.     Both teachers were shot. Then the Shooter shot children and the whiteboard in Classroom 112.

125.     A UPD Sergeant approached the south doorway of the West building and transmitted over the radio, "Shots fired! Get inside! Go, go, go!" (11:35 a.m.). Gun smoke and a cloud of debris from drywall hung visibly in the hallway outside Classrooms 111 and 112. There were bullet holes in the walls and spent rifle casings on the floor.

126.     UPD and UCISD-PD officers entered the building. They heard gunfire in Classrooms 111 and 112. They saw and smelled the gun smoke and drywall cloud. (11:35 a.m.). They knew this was an active shooter incident.

127.     Officers now inside the building included Defendants UCISD-PD Officer Adrian Gonza-les and UCISD-PD Chief Arredondo.

128.     The Shooter fired another barrage of gunfire in Classrooms 111 and 112. (11:35 a.m.).

129.     The teacher in Classroom 106 heard screaming. Bullets came through the interior wall of her classroom, opposite Classroom 112.

**I.      Defendant Officers from the TXDPS Arrive on Scene within Two Minutes of the Shooter Entering the School, While the Shooter is Shooting Inside Classrooms 111 and 112.**

130.     Defendant TXDPS Sergeant Juan Maldonado arrived on scene within sixty

seconds of the Shooter entering the West building. TXDPS Trooper Elizondo arrived on scene one minute after that. (11:35 a.m.).

131.     Unlike UPD and UCISD-PD responders, Sergeant Maldonado and Trooper Elizondo represented the TXDPS. According to its own website, TXDPS is the "premier law enforcement agency" in the state of Texas, and "one of the finest in the nation." TXDPS total agency budget for the 2022 fiscal year was over $1.6 billion, of which $27,004,064 was allocated to the Texas Rangers alone. In comparison, the 2021-2022 budget for the UCISD had a total of $435,270 allocated to security and monitoring services, or .03% of the TXDPS budget.

132.     TXDPS's mission is to "Protect and Serve Texas." TXDPS's role is to provide public safety capabilities that smaller law enforcement agencies in Texas either do not have or cannot sustain at the level and intensity needed. TXDPS's mandate includes responding to and taking responsibility over threats to public safety in Texas, including mass attacks in public places and individual radicalized violent actors. This role is crucial when active public safety threats occur in communities with smaller police departments that have less personnel and resources, like the active shooter incident at Robb Elementary School on May 24, 2022.

133.     Standards for TXDPS officers are high. Per TXDPS, "[a] Trooper must be educated, competent, and capable of handling every situation. A Trooper must be a problem-solver, a critical thinker, and must work independently." TXDPS officers are trained in active shooter response under the ALERRT protocols and in SWAT tactics.

134.     At least 91 officers from TXDPS responded to the active shooter incident at Robb Elementary School on May 24, 2022.

135.     Police sergeants typically coordinate and control front line responses and investigations, allocating resources, directing activities, managing risk, and reviewing progress

of investigations. TXDPS Sergeant Maldonado had supervisory authority over TXDPS troopers

on scene.

**J.      UCISD-PD Officers Retreat, Trapping Students and Teachers with the
         Active Shooter, while TXDPS Officers Hesitate.**

136.    The Shooter began another barrage of gunfire inside the classrooms. (11:36 a.m.).

137.    On information and belief, although they could hear the active shooting inside the

school, TXDPS Sergeant Maldonado and TXDPS Trooper Elizondo moved toward the school

but hesitated outside.

138.    A child in Classroom 111 called 911 and whispered, "Help me." She said she was

in Room 111. Dispatch told the child to stay on the line. (11:36 a.m.). This information is never

reported out over the radio.

139.    Officers approached Classrooms 111 and 112. These officers included UCISD-PD

Chief Arredondo and UCISD-PD Officer Adrian Gonzales.



**Figure 2: Classroom 112's Door, with Broken Window Glass and Bullet Holes from the Shooter**

140.    On information and belief, UCISD-PD Chief Arredondo and UCISSD-PD Officer

Gonzales saw the classroom doors.

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

141.    As officers, including Arredondo and Gonzales, approached Classrooms 111 and 112, they also saw the bullet holes in the walls and the 5.56 NATO rounds on the floor. One officer said, "It's an AR. It's an AR."

142.    As they approached the classrooms, the Shooter continued firing. An officer suffered a graze on his ear from shrapnel and another officer received a minor graze wound.

143.    All officers on scene knew that a subject had fired a weapon at a school, and he was an active shooter until neutralized. ALERRT doctrine required that officers on scene immediately isolate and neutralize the Shooter in order to stop the killing and stop the dying.

144.    Officers rejected ALERRT doctrine. They stopped and then retreated. (11:36 a.m.). They abandoned wounded children and teachers in Classrooms 111 and 112, who remained locked down and still waiting for first responders to open the door.

145.    The officers took positions at either end of the hallway, "containing" the Shooter so he could not escape from Classrooms 111 and 112.

146.    Their actions trapped the locked down students and teachers in Classroom 111 and 112 with the active shooter.

147.    TXDPS Trooper Elizondo was on the east side of the building and heard the gunfire inside the school. (11:36 a.m.).

148.    A teacher called 911, stating she was in the closet in the fourth-grade building. Dispatch broadcasted that there was a teacher in a closet and that someone was banging on the door where they were hiding. (11:36 a.m.).

149.    Defendant TXDPS Sergeant Maldonado was at the north hallway entrance by 11:37 a.m. He understood that the Shooter was in the building, and in a classroom. Another officer told Defendant Maldonado they had to go in because the Shooter was shooting in a

classroom. In violation of ALERRT doctrine, Defendant Maldona-do signaled that officers in the hallway should wait because "DPS is sending people."  (11:37 a.m.).

150.    The Shooter fired approximately three more shots. (11:37 a.m.).

151.    After the Shooter fires shots inside classrooms 111/112 and officers are retreating, UCISD-PD Chief Arredondo stopped at classroom 110. (11:37 a.m.)

152.    A UPD officer reported, "we have him contained." (11:37 a.m.).

153.    In a phone call to dispatch, Defendant UCISD-PD Chief Arredondo said, "we don't have enough fire power right now it's all pistol and he has an AR15." But in fact, at least one officer had already arrived on the scene armed with an AR-15 and extra magazines five minutes before.

154.    Every single officer on scene, including all Defendants on scene, knew that this was an active shooter; and knew or disregarded an excessive risk that children and teachers in the West building were the Shooter's targets, and that some of those children and teachers must already be hit. Every single officer knew and understood that by prolonging the confinement of West building's students and teachers with the Shooter, they were very likely harming and endangering those students and teachers. Regardless, the officers, including Defendants TXDPS Sergeant Maldonado, TXDPS Trooper Elizondo, UCISD-PD Chief Arredondo and UCISD-PD Officer Gonzales confined the Shooter in Classrooms 111 and 112 and continued the lockdown of students and teachers in those classrooms.

**K.    The Uvalde County District Attorney's Office Alerts TXDPS Ranger Kindell About the Active Shooting.**

155.    On the morning of May 24, 2022, Ranger Kindell was working from home. He received a call from the Uvalde County District Attorney's Chief Investigator alerting him about a possible active shooter incident.

156.     The District Attorney's Investigator's call to Ranger Kindell was no accident. Rangers are an elite division of the Texas Department of Public Safety. Of the thousands of law enforcement officers in the state of Texas, only 166 are commissioned Rangers. "A Ranger is an officer who is able to handle any given situation without definite instructions from his commanding officer or higher authority," according to the Ranger's website. Texas Rangers have jurisdiction everywhere and anywhere in Texas.

157.     Ranger Kindell had twenty years of experience as a TXDPS officer, as well as rapid response training and training on how to teach civilians to respond to active shooters.

158.     Ranger Kindell had the authority to exercise de facto supervisory authority over TXDPS, UPD, UCISD-PD and County law enforcement officers.

159.     Ranger Kindell called a UPD Sergeant who was on scene to get more information. The UPD Sergeant told Kindell that the Shooter was shooting in the classroom and requested shields, equipment, and rifles. On information and belief, Kindell did not direct the UPD Sergeant to immediately follow ALERRT protocols to isolate and neutralize the Shooter. Instead, Kindell indicated that it was acceptable to wait until more re-sources arrived before engaging the Shooter.

160.     Defendant Knew There Were Students and Teachers in Classrooms 111 And 112 and Defendant Kept Those Students and Teachers Trapped with The Shooter.

161.     Teacher Eva Mireles was lying wounded on the floor of Classroom 112. Her students saw her bleeding. She managed to call her husband, UCISD-PD Officer Rubin Ruiz. She told him she was shot. UCISD-PD Officer Ruiz told multiple officers that the shooting was happening in his wife's classroom. (11:37 a.m.).

162.     All officers in the northside hallway heard, knew and understood that there was a

wounded, but alive teacher locked down in the classrooms with the Shooter. Regardless, they continued to confine students and teachers in Classrooms 111 and 112 with the active shooter.

163.    A UPD Sergeant repeated, "we have got to get in there."

164.    A Customs Border Patrol Agent (CBP BPA) arrived and positioned himself along the wall at the T intersection at the north end of the hallway. (11:38 a.m.).

165.    TXDPS Captain Joel Betancourt obtained confirmation that that there was a shooting at Robb Elementary School and headed there.

166.    The first request to activate Uvalde SWAT was made over the radio by a UCISD-PD Officer. (11:38 a.m.).

167.    An officer commented over the radio "I have a male subject with an AR." (11:39 a.m.).

168.    The UPD Acting Chief radioed for "any agency available" to come out and help. (11:39 a.m.).

169.    A UPD Sergeant was outside of the building and on the phone with a member of the United States Marshals Service task force, of which they are a member, explaining "shots fired at the school…guy's inside the classroom now…he's in a classroom, actively shooting" and asked for assistance, saying "the more help the bet-ter." (11:39 a.m.).

170.    UPD Acting Chief Mariano Pargas called out on the radio for "any agency available to come out and help." (11:39 a.m.). At this time, at least four law enforcement agencies were already present at the school (UCISD-PD, UPD, TXDPS and CBP BPA).

171.    In classroom 102, a teacher called 911. She said they were locked down in the classroom and that she believed someone was shot in another classroom in the building. (11:40 a.m.).

172.    UCISD-PD Chief Arredondo used his phone to call dispatch from inside the West Building and said that the Shooter was inside the building armed with an AR-15 style rifle. Chief Arredondo said he "need[s] a lot of firepower" and that he wanted "the building surrounded." While on the phone with dispatch, he learned about the teacher in classroom 102's 911 call and he asked dispatch whether the teacher was with the shooter, but dispatch did not know. He then said that he needs more firepower, because they only have handguns and they "need to surround the building." He told the dispatcher "I need you to be my radio for me." (11:40 a.m.).

173.    UPD radio broadcasted, "Male subject is still shooting." On information and belief, TXDPS and UCISD-PD Officers at the scene and responding to the scene heard this transmission. (11:41 a.m.).

174.    Emergency medical responders arrived in front of the school. (11:41 a.m.).

175.    Uvalde County Sheriff's Office (UCSO) officers arrived at the north side of the West Building and positioned themselves at the entryway. They learned the Shooter had fired multiple shots inside classrooms and that it was unknown if children were inside.  (11:41. a.m.).

176.    TXDPS Trooper Elizondo finally entered the West building. She had previously been standing outside of the doorway. (11:41 a.m.).

177.    A teacher in Classroom 102 texted her husband, a Border Patrol Agent: "There's an active shooter. Help. Love you." (11:41 a.m.).

178.    UPD radio broadcasted that there was a possible gunshot victim in a classroom. (11:41 a.m.). On information and belief, TXDPS and UCISD-PD officers at the scene and responding to the scene heard this transmission. They knew that they had trapped the Shooter with the victim and cut her off from help, and that they were continuing her entrapment without medical assistance.

179.     Family members of children started arriving, congregating near a funeral home across Geraldine Avenue from Robb Elementary School's West building. Law enforcement officers, however, created a perimeter and prevented those parents from coming through to the West building. (11:41 a.m.).

180.     UPD radio broadcasted that class in Classroom 112 "should be in session right now ... the class should be in session right now." (11:42 a.m.). On information and belief, TXDPS and UCISD-PD officers at the scene and responding to the scene heard this broadcast. This broadcast confirmed what many already understood – that they had trapped the Shooter with students and teachers in Classrooms 111 and 112, and that the decisions of the officers on site were keeping those students and teachers locked down with the Shooter.

181.     TXDPS Trooper Elizondo was present in the West building. (11:42 a.m.).

182.     A girl in Classroom 112 said something. She may have said, "Officers, help us." The Shooter heard her. He walked over to her and shot her. (The timing of this shot cannot yet be alleged, although it seems likely it was the shot at 11:44 a.m.).

183.     All officers inside and outside the West building heard a shot. (11:44 a.m.).

184.     An unknown law enforcement officer at the northwest entrance said that the Shooter was in a classroom "with kids." (11:45 a.m.).

185.     The Shooter sat at Teacher Arnulfo Reyes' desk in Classroom 111. Sometimes he kicked children's bodies and mocked them. He dropped Teacher Reyes' cell phone on his back and dribbled water on him to see if he would move. Arnulfo Reyes was still alive and had only been shot in the arm at this point.

**L.     Defendants Stopped Parents from Rescuing the Children Trapped Inside Classrooms 111 and 112.**

186.     As the incident progressed, parents learned of the danger to their children. They

came to the school, where law enforcement had set up a perimeter. Parents begged the officers to save their children. Then parents tried to save their children themselves. Officers physically restrained parents and family members from getting closer to the school.

187.     Parents told law enforcement officers kids were inside. (11:46 a.m.). Parents told officers, "Either you go in or I'm going in."

188.     When parents tried to break through the law enforcement perimeter, law enforcement officers, including TXDPS and Uvalde County Sheriff's Office ("UCSO") officers stopped them.

189.     One man surrounded by law enforcement officers was knocked down. As he lay on his back on the ground, at least two TXDPS Doe Defendant officers stood over him and prevented him from getting up, while several officers in the immediate vicinity watched.

190.     One parent attempting to reach her children was handcuffed and another was tasered by a law enforcement officer.

191.     The officers' conduct was cruel. Defendant Trooper Elizondo later admitted, "If my son had been in there, I would not have been outside. I promise you that." And yet officers stopped parents, ensuring that parents could not reach their children.

### M.     Law Enforcement Officers Saved Themselves, Not Children, from the Shooter's Lethal Battle Rifle.

192.     The Shooter was armed with a Daniel Defense DDM4v7, an AR-15 style rifle, and multiple high-capacity 30-round magazines containing NATO 5.56 cartridges.

193.     ALERRT doctrine makes no exceptions for AR-15s. AR-15 style rifles are renowned for the size and severity of the wounds they produce and the likelihood that the rounds they fire will pierce body armor, walls, and other barriers. The command to "stop the killing, stop the dying" is even more urgent when an active shooter is using an AR-15.

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

194.    The AR-15's presence and power could be felt from the first moment officers entered the West building. 5.56 NATO rounds from the Shooter's AR-15 had penetrated the class-room walls into the hallway. Officers noted that the Shooter had an AR-15 at 11:36 a.m.

195.    A UPD Sergeant got on his radio to warn others. "I have a male subject with an AR," he said. "Fuck," an officer replied, "AR," another exclaimed, alerting others nearby.

196.    The presence of the lethal AR-15 paralyzed the response. A UPD officer commented later, "I knew too it wasn't a pistol. ... I was like, 'Shit, it's a rifle,'" he said. He added, "The way he was shooting, he was probably going to take all of us out." Officers reasoned there was "no way" to take action, and the only thing they could do was wait. One UPD Sergeant said, "You knew that it was definitely an AR.... There was no way of going in.… We had no choice but to wait and try to get some-thing that had better coverage where we could actually stand up to him." ALERRT doctrine utterly rejects this excuse for delay. In an active shooter incident, the only choice is immediate isolation and neutralization of the shooter, because that is the only action that stops the killing and stops the dying.

197.    Officers did not want to move forward until they had rifle-rated shields. A UPD Lieutenant later said, "[you] can only carry so many ballistic vests on you. That .223 (caliber) round would have gone right through you." Defendant UCISD-PD Chief Arredondo said he "need[ed] lots of firepower" because of the Shooter's AR-15.

198.    Defendant TXDPS Sergeant Maldonado was with troopers outside the West building. He said, "This is so sad dude…. He shot kids bro." Officers standing with him discussed that they knew this was something that needed to be done "now" and "ASAP." Defendant TXDPS Officer Richard Bogdanski asked, "You know what kind of gun?" and an officer responded "AR, he has a battle rifle." "What's the safest way to do this? I'm not trying to

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

get clapped out," Defendant Bogdanski replied.

199.    The same officers knew that the Shooter had used his AR-15 to unleash barrages of fire on teachers and students. Every minute that officers waited on rifle-rated shields, "lots of firepower," and even aerial support, children and teachers faced the Shooter with no protection at all.

**N.      Officers were Indifferent to the Fact that a Teacher Is Dying Inside Classroom 112.**

200.    Three Border Patrol agents entered through the northwest door carrying ballistic shields and other equipment. (11:51 a.m.).

201.    Although he knew students and teachers were confined with the active Shooter in Classrooms 111 and 112 and had heard the Shooter fire repeatedly, Defendant UCISD-PD Chief Arredondo intended to "start negotiations" with the Shooter. (11:55 a.m.).

202.    Officer Ruiz tried again to save his wife and the students who were with her. He told officers in and around the West building that his wife, a teacher in Classroom 112, had been shot. Officers were indifferent to teacher Eva Mireles' plight. They stopped Officer Ruiz from entering Classrooms 111 and 112, took his weapon and escorted him out the door. (11:56 a.m.).

203.    Inside the West building, Defendant TXDPS Special Agent Luke Williams was in the hallway outside of one of the classrooms with two other Doe Defendant TXDPS officers. (11:57 a.m.).

204.    While driving to Robb Elementary School, Defendant TXDPS Captain Betancourt spoke with a Uvalde County Sherriff for updates.

205.    By 11:59 a.m., at least eight TXDPS officers and at least seven Border Patrol Agents and one US Marshal had been in or were currently inside of the West building.

206.    Defendant Ranger Kindell arrived on scene. He was told that the Shooter was

inside Classrooms 111 and 112. (11:59 a.m.).

207.    Defendant UCISD-PD Chief Arredondo again attempted to negotiate with the Shooter from the hallway. (11:59 a.m. – 12:01 p.m.).

208.    Inside classroom 111, Teacher Arnulfo Reyes heard the police speaking to the Shooter and attempting to negotiate.

209.    Doe Defendant TXDPS Sergeant outside of the northwest entrance of the West building stated that that the Shooter shot kids. (12:02 p.m.).

210.    A child in classroom 112 called 911. The child pleaded for help. The call lasted one minute. (12:03 p.m.). The call information is not shared over radio.

211.    Officers evacuated children from some classrooms in the West building. Like the children in Classrooms 111 and 112, those children and teachers had stayed still and silent, waiting for first responders to open the door, exactly as the lockdown drill requires.

212.    Misinformation that UCISD-PD Chief Arredondo was in the room with the Shooter continued to be shared, including by a UCSO deputy to a game warden on scene. (12:05 p.m.).

213.    Defendant Ranger Kindell ordered that TXDPS send all troopers available to assist with crowd control. (12:06 p.m.).

214.    Parents were moving toward the northwest corner of the school. Some were armed. Officers stopped them. (12:07 p.m.).

215.    UCISD-PD Chief Arredondo asked a UPD Sergeant to find a master key from one of the school officials to access room 109. The UPD Sergeant walked toward the west side of the building asking whether anyone had a master key. Uvalde County Precinct 6 Constable Zamora said he thought the other side had master keys. (12:08 p.m.).

216.    Chief Arrendondo told the UPD Sergeant they were waiting for a master key and that room 109 needs to be cleared and vacated before they do any kind of breaching, saying "Time is on our side right now. I know we got kids in there, but we gotta save the lives of the other ones." An officer told Chief Arredondo that BORTAC has just arrived, and he replied that BORTAC needs to wait, saying "Tell them to calm the [expletive] down for a minute."  (12:09 p.m.).

217.    An officer suggested breaking the windows to evacuate room 109 instead of waiting for the master key. Chief Arredondo declined, saying he did not want to create any noise that might cause the Shooter to fire in that direction as they were evacuating. He called Constable Field about the need to get a master key and verify that the hallway is vacated. (12:10 p.m.).

**O.    A Fourth Grader Calls 911 from Inside Classroom 112 and Defendants Were Indifferent to the Children's and Teachers' Cries for Help.**

218.    In Classroom 112, fourth grader M. C. had covered herself in her friend's blood so the Shooter would believe she was dead.

219.    M.C. and her friend knew some of the wounded in Classroom 112 were running out of time. They had watched one of their classmates be shot as she tried to call 911. But their teacher Eva Mireles was dying. They quietly took a teacher's phone and called 911. (12:10 p.m.).

220.    911 dispatch called a child back who previously called from classroom 112 and hung up. The child stated they were in a room full of victims. The call lasted approximately 16 minutes. (12:10 p.m.).

221.    On information and belief, Ranger Kindell told other officers that he had someone in the building who would handle going into the classrooms.

222.    On information and belief, the UPD Acting Chief deferred to Ranger Kindell,

understanding that he had taken command. (12:10 p.m.). Other UPD officers did the same. (12:11 p.m.).

223.     UPD radio broadcasted that a child had called 911 and was in a room full of victims. This transmission was heard on both sides of the hall and outside the building. (12:12 p.m.).

224.     Chief Arredondo told Constable Zamora he was waiting for a master key and that he told a UPD Sergeant to get him one. (12:12 p.m.).

225.     The BORTAC Commander, who was now inside the building, was told that there were victims inside Classrooms 111 and 112. (12:13 p.m.).

226.     Officers prolonged the lockdown looking for keys (which they did not need because the door to Classroom 111 was not locked). (12:13 p.m.).

227.     M.C. and her friend whispered to the 911 dispatcher that their teacher was still alive and needed help. They asked for help. (12:13 p.m.).

228.     Dispatch alerted officers in the West building. The UPD Acting Chief said, "a child just called. They have victims in there. Called 911." (12:13 p.m.).

229.     Constable Zamora reiterated Chief Arredondo's direction that there should be no entry until Arredondo gives permission. After asking a UPD Sergeant about the status of the master keys, Constable Zamora went to the other side of the hallway to obtain master keys. (12:13 p.m.).

230.     The children in Classroom 112 were trying to keep quiet, but some were wounded, and they were all terrified. Dispatch asked how many children were in the room and the child estimated up to eight. Fourth grader M. C. also advised others around her to try to keep quiet as some were crying and moaning. One teacher was dead, and one was dying. There was no

one to help them stay quiet. M. C.  and her friend told 911, "send an ambulance right away." (12:14 p.m.).

231.    Constable Zamora, having come from the other side of the building to find a master key, obtained a large set of keys with a big ring attached to a red lanyard from a UPD Detective. He saw a UCISD-PD lieutenant, who stopped to help him look through the keys.  The lieutenant broke some off and handed them to Zamora, saying one of them would open all of the doors. (12:14 p.m.).

232.    The children in classroom 112 on the 911 call said to please hurry. Their teacher was about to die. (12:15 p.m.). They asked if they should open the door. They were trying to save their teacher's life. They knew she needed help. Dispatch told them to stay quiet. They said that their teacher wouldn't stay quiet. (12:16 p.m.).

233.    An officer stressed to UPD Acting Chief Pargas that "the room is full of victims." Chief Par-gas walked away to phone dispatch, asking if there were enough EMS on standby and inquired about the call from the child. (12:16 p.m.).

234.    Constable Zamora arrived in the south hallway with a set of keys. Chief Arrendondo tried them on room 109 but they did not work. A TXDPS Sergeant says BORTAC is going in, but Arredondo said they need to secure room 109 first. The TXDPS Sergeant then relayed to the BORTAC commander that they needed to clear classroom 109 first. (12:16 p.m.).

235.    Dispatch said they are sending officers, but no help came. (12:17 p.m.).

236.    Fourth grader M. C. and her friend said officers needed to come now, but no one came. (12:18 p.m.).

237.    Dispatch continued to tell them not to open the door. (12:19 p.m.).

238.    Still unable to open the door to room 109, a UPD Sergeant asked if anyone in the

hallway had breaching tools, but none of the 15 officers in the hallway responded that they did. (12:20 p.m.).

239.    The Shooter was in Classroom 111. He shot Teacher Arnulfo Reyes in the back. Then he shot at the children under the table again.

240.    In Classroom 112, fourth grader M. C. and her friend were still on the phone with 911 dis-patch. They said, "he's shooting." Dispatch told them to stay quiet. (12:21 p.m.).

241.    Defendants' officers heard the shots. They already knew children and a teacher were alive and trapped inside; now they knew he was shooting at them again.

242.    On the south side of the hallway, UCISD–PD Chief Arredondo continued to try to negotiate with the Shooter, "can you hear me, sir? Can you hear me, sir?" (12:21 p.m.).

243.    Chief Arredondo called for the windows of classroom 109 to be broken out to start evacuation. (12:22 p.m.).

244.    Texas Ranger Kindell heard the gunfire. He had been on scene for 24 minutes. He was now in the West building, also planning to negotiate with the Shooter, in direct violation of ALERRT protocols. On information and belief, he knew negotiation would continue to trap students and teachers who were still alive in Classrooms 111 and 112 with the Shooter. (12:23 p.m.).

245.    Officers continued to try to find a key that would work on the doors to Classroom 111 and 112, even though the door to Classroom 111 was unlocked. Officers heard faint cries coming from a nearby classroom saying they could "hear children." (12:23 p.m.).

246.    A BORSTAR medic said to officers in and near the West building, "the victims have been bleeding for a while." (12:24 p.m.). A BORSTAR commander tested the set of keys on the janitor's closet next to classroom 112 and learned that they did not work. (12:24 p.m.).

Officers still did not permit the medic to approach Classrooms 111 and 112. The child in classroom 112 on the phone with 911 remained on the phone. (12:24 p.m.).

247.    An officer said, "There's a teacher shot in there." Another officer responded, "I know." (12:27 p.m.). The BORTAC commander reviewed the school map with the game warden, which was later found to omit important details such as the adjoining doors between classrooms 111 and 112. (12:27 p.m.). Chief Arredondo said that he was going to find some keys to test for classrooms 111/112. (12:27 p.m.). The 911 call with the child inside room 112 dropped. (12:27 p.m.).

248.    Officers waited for another key to arrive. (12:28 p.m.). Constable Zamora spoke with a UCISD-PD lieutenant, and both said that they have someone bringing them keys. (12:29 p.m.).

249.    TXDPS Captain Betancourt arrived on scene. (12:30 p.m.).

250.    Twenty-one minutes elapsed, while officers, including Ranger Kindell and all TXDPS and UCSID-PD officers continued to contain the Shooter with living children and teachers in Classrooms 111 and 112.

251.    The BORTAC commander exited the hallway to retrieve a Halligan tool from their vehicle. (12:32 p.m.).

252.    A Texas Ranger entered the hallway and handed a new set of keys to the BORTAC commander who tested them in the janitor's closet, then on rooms 131 and 132 and confirmed they work as master keys on multiple doors. (12:36 p.m.).

253.    Chief Arredondo was on the phone saying that the keys should be tested on other doors before using them to enter classrooms 111/112. He continued trying to communicate with the Shooter. (12:37 p.m.).

254.     Chief Arredondo continued talking on the phone and made a statement about being unable to get the door open. There was general confusion among officers on the south side about whether anyone was making entry and if the door was locked. Their conversation continued for another three minutes. (12:42 p.m.).

255.     Officer conversations about the key and entering rooms 111/112 continued. Someone referred to approaching classrooms 111/112 as a "death sentence." (12:43 p.m.).

256.     On the radio, Defendant TXDPS Captain Betancourt said "Hey, this is DPS Captain Betancourt. The team that's going to make breach needs to stand by. The team that's gonna breach needs to stand by." (12:48 p.m.).

257.     Finally, at 12:49 p.m. – over 73 minutes since officers first confined the Shooter with the students and teachers in Classrooms 111 and 112 – a team lead by the BORTAC Commander opened the door to Classroom 111, ending the lockdown. (12:49 p.m.). The Shooter was killed, and no one on the entry team was seriously injured. (12:50 p.m.).

**P.      Officers' Decision to Contain the Shooter with His Victims Caused Children and Teachers to Suffer and Die.**

258.     Officers, including Defendants TXDPS Sergeant Maldonado, TXDPS Trooper Crimson Elizondo, UCISD–PD Chief Arredondo, and UCISD–PD Officer Gonzales, were on scene by 11:35 a.m., while the Shooter was firing in Classrooms 111 and 112. Defendant Kindell was told this was an active shooter incident at approximately 11:35 a.m., acted in a supervisory capacity from that moment forward, and arrived on scene at 11:59 a.m.

259.     At 11:36 a.m., officers approached Classrooms 111 and 112 to breach the doors. When the Shooter fired and two officers were hit by shrapnel, they retreated instead of isolating and neutralizing the Shooter. Their actions confined the Shooter in the same two rooms as his victims for 73 minutes.

260.     The Defendants' actions gave the Shooter leisure to torture and traumatize his victims. Children watched the Shooter tell classmates, "It's time to die," and shoot them. Using the victims' blood as ink, the Shooter wrote "LOL," on the whiteboard in Classroom 111. On information and belief, the Shooter mocked wounded children and kicked them to see if they were dead.

261.     During those 73 minutes, the Shooter fired 19 more times: eleven shots over 53 seconds at 11:36 a.m.; three shots at 11:37 a.m.; one shot at 11:44 a.m.; and four shots at 12:21 p.m.

262.     One of those shots was fired at close range into teacher Arnulfo Reyes' back, as he lay prone on the floor in Classroom 111.

263.     One shot killed the child in Classroom 112 whom the Shooter heard asking for help.

264.     On information and belief, the remaining 16 shots were aimed at children, including the Child Plaintiffs, and some or all of those shots wounded or killed one or more of the Child Plaintiffs.

265.     In addition to enabling the Shooter to fire 19 rounds at his victims at close range, Defend-ants' actions denied wounded victims, including the Child Plaintiffs, crucial medical care.

266.     On information and belief, earlier medical intervention could have saved at least one of the Child Plaintiffs.

267.     Some Child Plaintiffs died while the Shooter terrorized them.

268.     The Child Plaintiffs who survived will never be the same.

**Q.     Plaintiffs Have Received Little Transparency and No Accountability.**

269.     Plaintiffs are grieving an unimaginable loss. Responding law enforcement

officers' betrayal of their children's trust – and theirs – increased their suffering exponentially. The officers and departments that failed these children owe plaintiffs complete transparency and full accountability, and again they have failed these families. To date, they have provided little transparency and no accountability.

270.    Each responding law enforcement agency, including the TXDPS, has some or all of the following records that show exactly what was done by whom on May 24, 2022: body camera footage, recordings of radio communications, dispatch transmission recordings and logs, and recorded and/or written statements of responding officers and victims.

271.    TXDPS has acknowledged that complete transparency is the right thing to do. Facing early public outrage about the law enforcement response, TXDPS Director McCraw promised, "When we get the ability to come talk to you, I'll go line by line in terms of what trooper did what …. what DPS officer. We'll be entirely transparent," and "[t]he public will have it – they'll have excruciating details in terms of what we did, when we did it and those gaps."

272.    TXDPS has broken its promise of transparency. In the almost two years since the shooting, the TXDPS has fought in court to conceal its body camera footage and radio traffic from Uvalde's victims and the public.

273.    The Texas Rangers investigated the response to the shooting, including the actions of the 91 responding TXDPS officers.

274.    In August 2022, the Texas Rangers asked Dr. Mark Escott, Medical Director for TXDPS and Chief Medical Officer for the City of Austin, to look into the injuries of the victims and determine whether any victims could have survived. The request was apparently a delaying tactic, not a search for the truth. Dr. Escott was never given access to autopsy reports or hospital and EMS records. A year later, the Rangers told Dr. Escott they were "moving in a different

direction" and no longer wanted the analysis to be performed. The Texas Rangers prevented evidence from being obtained that would have proven that these children were alive while officers could have acted timely to save them. This constitutes the spoliation of evidence.

275.    The TXDPS delivered a final report to the Uvalde County District Attorney so that she could determine whether to press charges. The TXDPS chose not to make that report public.

276.    The Uvalde County District Attorney has provided the TXDPS with another means to delay and avoid transparency. The District Attorney refuses to release crime scene photos, ballistics analysis, autopsies, and other information that would enable Plain-tiffs to allege with greater specificity what happened in Classrooms 111 and 112.

277.    Nor has the TXPDS held any of its officers fully to account for their actions. Minutes of a state police captains' meeting document Director McCraw as telling his officers, "no one is going to lose their jobs" for their conduct during the shooting.

278.    Defendant Kindell was suspended in September 2022 for failing to perform his duties and was issued a preliminary termination letter by TXDPS Director McCraw in January 2023. Defendant Kindell was given the opportunity to meet with McCraw before the termination decision was finalized, but according to a TXDPS spokesperson, that meeting will not occur until the grand jury has made a decision on criminal charges. Defendant Kindell continues to draw a Ranger's salary.

279.    Defendant Elizondo resigned from TXDPS while under investigation for actions inconsistent with training and Department requirements in connection with her response at Robb Elementary on May 24, 2022.

280.    Defendant Maldonado was served termination papers by TXDPS in October 2022

following an investigation into his actions at Robb Elementary on May 24, 2022. TXDPS did not disclose the grounds for his termination. TXDPS ultimately did not terminate Defendant Maldonado and allowed him to retire instead.

281.    Defendant Betancourt's actions at Robb Elementary on May 24, 2022 were investigated by TXDPS, but he remains employed with the agency.

282.    To date, not one person from TXDPS has been fired in connection with their response to the shooting at Robb Elementary on May 24, 2022.

283.    A total of 376 law enforcement officers responded to the active shooter incident at Robb Elementary School: 91 TXDPS officers, 26 officers from the UPD, 179 officers from federal agencies, county sheriffs and constables from Uvalde and elsewhere, and the five UCISD-PD officers.

### CAUSES OF ACTION

### II.    FIRST CAUSE OF ACTION:<br>DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983

284.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

285.    The TXDPS Defendants and individual UCISD-PD Defendants responded to an active shooter incident at a school.

286.    On information and belief, and as previously alleged, these Defendants knew even before they arrived on scene that this was an active shooter incident, and that their duty was to neutralize the Shooter immediately.

287.    Defendants knew that the students and teachers in all classrooms at Robb Elementary School – including Classrooms 111 and 112 – were required to and would follow lockdown procedures and that those lockdown procedures required those children and teachers to

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

remain in their classrooms until authorized by law enforcement personnel to leave.

288.    When Defendants arrived on scene, they took control of the physical location of the Shooter and the children and teacher who were his victims. They confined the Shooter to Classrooms 111 and 112. They trapped three teachers and thirty students with him.

289.    Each Defendant knew that the Child Plaintiffs were unable to provide for their own safety when confined to a classroom with an active shooter carrying an AR-15.

290.    Defendants also set up and enforced a perimeter around the school.

291.    Each Defendant knew and intended that this law enforcement perimeter would prevent parents from reaching their children inside Robb Elementary School.

292.    Each Defendant knew that their actions were preventing the Child Plaintiffs' parents and/or spouses from reaching Classrooms 111 and 112 to provide safety from the Shooter.

293.    Medics arrived on scene to provide life-saving care for those wounded by the Shooter.

294.    Each Defendant knew that their actions were delaying needed medical care from reaching the wounded in Classrooms 111 and 112.

295.    For any and all of these reasons and as previously alleged, the Child Plaintiffs and teacher were in the custody of Defendants. Again, state-mandated lockdown drills required children and teachers to remain in the classroom until authorized to leave by law enforcement officers.  Following those drills, children and teachers stayed still and silent. Finally, in desperation, they called 911 and begged for help and permission to leave and were told by dispatchers to remain in place. Parents were not permitted to provide protection to their children either. Law enforcement officers ensured through their actions that no person would be permitted

to rescue or protect the children and their teachers other than law enforcement officers.

296.    Each Defendant knew that students and teachers in Classrooms 111 and 112 were confined with the Shooter, unable to provide for their own safety, and cut off from receiving assistance from their parents, medics or anyone but law enforcement. Thus, each Defendant knew students and teachers in Classrooms 111 and 112 were in their custody.

297.    While in Defendants' custody, the Child Plaintiffs had constitutional rights to be free from bodily harm, abuse, and psychological torture.

298.    Each Defendant violated those rights of the Child Plaintiffs and teachers.

299.    Each Defendant acted with deliberate indifference to the plight of the Child Plaintiffs and teachers.

300.    Each Defendant knew and understood that the longer locked down children and teachers remained trapped with the Shooter, the more students and teachers were likely to die, either because the Shooter would find them and shoot them, or because they would succumb to wounds that he had already inflicted.

301.    The known and obvious consequences of each Defendant's actions were that the students and teachers in their custody would be shot, deprived of life-saving medical care, and terrorized by the Shooter.

302.    In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions.

303.    These actions by the TXDPS Defendants and individual UCISD-PD Defendants result-ed in the death, wounding, and/or psychological terror of the Child Plaintiffs.

304.    If these Defendants, or any one of them, had acted to protect the reasonable safety of the Child Plaintiffs, they would not have the debilitating and permanent injuries and trauma

they have today.

305.     Further, had parents been able to reach the West building, they or law

enforcement officers would have breached the classrooms and neutralized the Shooter well

before 12:49 p.m., and emergency personnel would have been able to enter the classrooms and

provide emergency medical services to wounded children and teachers.

306.     If parents had breached the classrooms, they would have been able to comfort and

rescue their children and been spared emotional torture and trauma.

307.     Further, these actions by the TXDPS deprived the parents of the right to protect

their children from the active shooter and to aid and comfort one or more of the Child Plaintiffs.

308.     As a direct and proximate result of Defendants' actions, Plaintiffs sustained the

damages hereinafter alleged.

### III. SECOND CAUSE OF ACTION: DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983 (SUBSTANTIVE DUE PROCESS, STATE CREATED DANGER)

309.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs

and all subsequent paragraphs as though fully restated herein.

310.     TXDPS and UCISD-PD created an environment dangerous to the Child Plaintiffs.

311.     These Defendants knew the environment was dangerous to the Child Plaintiffs.

312.     These Defendants created an opportunity that would not have otherwise existed

for the Shooter to harm one or more of the Child Plaintiffs.

313.     These Defendants' actions caused the Child Plaintiffs to be exposed to acts of

violence by the Shooter and increased the risk that the Child Plaintiffs would be exposed to such

acts of violence.

314.     These Defendants' actions placed the Child Plaintiffs specifically at risk.

315.    These Defendants knew or should have known that their actions were specifically endangering students and teachers in Classrooms 111 and 112, including the Child Plaintiffs.

316.    The harm to the Child Plaintiffs caused by these Defendants' actions was foreseeable and direct.

317.    The known and obvious consequences of each of these Defendant's actions was that the students and teachers in their custody would be shot, deprived of life-saving medical care, and terrorized by the Shooter.

318.    In carrying out these actions, these Defendants acted with disregard for the known and obvious consequences of their actions.

319.    Each Defendant's actions caused the death, wounding, and/or psychological torture and trauma to one or more of the Child Plaintiffs.

320.    Further, these actions by Defendants deprived the Child Plaintiffs' parents of the right to protect their children from the active shooter and to aid and comfort one or more of the Child Plaintiffs.

321.    As a direct and proximate result of these police actions, Child Plaintiffs sustained the damages hereinafter alleged.

### IV.    THIRD CAUSE OF ACTION: DEFENDANTS' VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AMENDMENT, UNLAWFUL SEIZURE)

322.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

323.    By using force and authority to involuntarily confine students and teachers inside Classrooms 111 and 112 with the active Shooter, the TXDPS and    other law enforcement seized the Child Plaintiffs, in violation of clearly established rights se-cured to them by the Fourth and

Fourteenth Amendments.

324.     These Defendants were deliberately indifferent to the rights of the minor Plaintiffs and the rights of the Plaintiffs.

325.     As a direct and proximate result of the misconduct of these Defendants as described herein, the Plaintiffs sustained the damages hereinafter alleged.

### V.     FOURTH CAUSE OF ACTION: UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S VIOLATION OF 42 U.S.C. § 1983 (VIOLATION FOURTH AND FOURTEENTH AMENDMENTS, FAILURE TO TRAIN/CREATION OF POLICY)

326.     Plaintiffs reallege and incorporates by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

327.     Despite clear national standards for active shooter incidents, the School District failed to ensure that their officers were adequately trained and failed to develop meaningful plans to address an active shooter incident.

328.     This lack of training and egregious delay demonstrated deliberate indifference to the Fourth and Fourteenth Amendment rights of students and teachers who would be locked down during an active shooter event including the rights of Plaintiffs.

329.     The School District failed to adequately train, supervise, and discipline the officers regarding how to identify and respond to an active shooter incident. The result was that UCISD-PD officers and TXDPS violated the clearly established rights secured to them by the Fourth and Fourteenth Amendments as previously alleged.

330.     The School District, acting as final policymaker, adopted an on-scene policy that was the ex-act opposite of "stop the killing and then stop the dying" and all other written active shooter policies. His policy was to confine their Child Plaintiffs, and other students and teachers

inside two classrooms with the Shooter, depriving them of emergency medical care and preventing rescue by their loved ones.

331.    By virtue of any and all of these actions and omissions, the School District was deliberately indifferent to the constitutional rights of the Child Plaintiffs.

332.    As a direct and proximate result of these actions and inactions, Plaintiffs sustained the damages alleged herein.

### VI.    FIFTH CAUSE OF ACTION: UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S VIOLATION OF 42 U.S.C. § 1983 (FOURTEENTH AMENDMENT SPECIAL RELATIONSHIP AND STATE CREATED DANGER, FAILURE TO TRAIN/CREATION OF POLICY)

333.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs and all subsequent paragraphs as though fully restated herein.

334.    The School District failed to adequately train, supervise, and discipline its officers regarding how to identify and respond to an active shooter incident. The result was that law enforcement officers employed by the School District confined the Child Plaintiffs with the Shooter and illegally created a dangerous environment for the Child Plaintiffs, as previously alleged. Further, the Child Plaintiffs were in the custody of law enforcement officers, as previously alleged

335.    The School District, acting as final policymaker, adopted a policy of confining the Child Plaintiffs with the active shooter and increasing the danger to them as previously alleged.

336.    By virtue of these actions and omissions, the School District was deliberately indifferent to the constitutional rights of the Child Plaintiffs.

337.    As a direct and proximate result of these actions, omissions and policies, the Plaintiffs sustained the damages alleged herein.

///

## VII.    PUNITIVE DAMAGES

338.    Each Defendant's conduct was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were aware of the serious and demonstrable risk of serious bodily injury and death associated with their conduct and that such risks are compounded and worsened by their intentional inaction.  With full knowledge of such risks, Defendants proceeded causing Plaintiffs to suffer severe physical, mental, and emotional harm.

## VIII.   RELIEF SOUGHT

339.    Wherefore, Plaintiffs respectfully request that the Court enter a judgment as follows:

a.  A declaratory judgment that defendants' conduct detailed herein was a violation of plaintiff's rights under the Constitutions and laws of the United States and Texas;

b.  To the extent that the Court finds that Defendants' conduct was authorized by custom, policy, or practice, and/or the inadequate training, supervision, instruction and discipline, a declaratory judgment that those customs, policies, or practices, and/or the inadequate trainings, supervisions, instructions, and disciplines are unconstitutional under the Fourteenth Amendments to the United States Constitution, and the analogous provisions of the Texas Constitution.

c.  Permanent injunctive relief to preclude similar acts by defendants at future gatherings.

d.  An award of past and future economic damages against all Defendants for the harms sustained by Plaintiffs in an amount to be determined according to proof at the time of trial;

e.  An award of general damages against Defendants, and each of them, for the physical, mental, and emotional damages, past and future, according to proof at the time of trial;

f.  An award of punitive and exemplary damages against the Defendants in an amount to be determined according to proof at the time of trial

g.  An award of attorneys' fees pursuant to 42 U.S.C. § 1983 and any other applicable provisions, and

h.  Costs of suit and pre- and post-judgment interest as permitted by law

## IX.    DEMAND FOR JURY TRIAL

340.    Plaintiffs respectfully demand a trial by jury.

## X.    SPOLIATION

341.    Plaintiffs require and demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the Uvalde school shooting or other violations made the basis of the Complaint and the alleged damages, including statements, photographs, videotapes, audiotapes, surveillance, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence. Failure to maintain such items will constitute "spoliation" of evidence, which will necessitate use of the spoliation inference rule- an inference or presumption that any negligent or intentional destruction of evidence was done because the evidence was unfavorable to the spoliator's case.

Dated:  May 24, 2024

**WISNER BAUM LLP**

/s/ *Stephanie Sherman*
Stephanie Sherman
Texas State Bar No. 24006906
ssherman@wisnerbaum.com
Monique Alarcon (*Pro Hac Vice*)

California State Bar No. 311650
malarcon@wisnerbaum.com
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Telephone: (310) 207-3233
Facsimile: (310) 820-7444

**LAW OFICE OF SHAWN C. BROWN**
Shawn C. Brown
Texas State Bar No. 24003613
shawn@shawnbrownlaw.com
540 S. St. Mary's Street
San Antonio, TX 78205
Telephone: (210) 224-8200
Facsimile: (210) 224-8214

*Attorneys for Plaintiffs*

PLAINTIFFS' COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL